[Crim. No. 16618. Second Dist., Div. Two. Oct. 21, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS FRANCIS BUTLER, Defendant and Appellant.

**Counsel**

James W. Anderson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Geoffrey S. Cantrell, Deputy Attorney General, for Plaintiff and Respondent.

**Opinion**

**ROTH, P. J.**—Thomas Butler appeals from a conviction by a jury of second degree murder (Pen. Code, § 187). The verdict was rendered on February 6, 1969. Probation was denied and appellant was sent to prison for the term prescribed by law on February 27, 1969.

Prior to these proceedings, appellant was tried on the same murder charge. The jury disagreed and a mistrial was declared.

At shortly after 8 p.m. on June 22, 1968, Los Angeles Police Officer Jackson proceeded to 1305 West 8th Street in Los Angeles in response to a call for an ambulance because of a "cutting." The ambulance call, according to hospital records, was received at 8:07 p.m.

Arriving at apartment No. 3 of the above address, Jackson found the victim, Mr. Fuji, lying on his back beside the bed in the bedroom. He was alive. The ambulance attendants were placing a bandage over a wound in his abdomen. Fuji was not wearing a shirt.

Appellant was standing nearby. Asked whether he knew what had happened, appellant stated he had arrived at 7 p.m., found the victim and immediately phoned for an ambulance. Fuji died at 10:41 p.m. that night. A medical expert testified that a person with a similar wound might remain conscious for one-half to one hour.

Jackson saw a bloodstained kitchen knife on the floor in the living room. He asked appellant if the knife were his. Appellant replied that it belonged to the apartment. After asking one of the ambulance attendants what time the call was received and receiving the reply, "Shortly after eight," appellant was placed under arrest and advised of his constitutional rights by Jackson's partner, Officer Akesson. No question is raised as to the adequacy of the warnings. Appellant said he wanted an attorney. Appellant then spontaneously stated, "I was just sitting here drinking a little beer and wine. I don't know what happened. I just found him lying on the

bed. That is all I have got to say." Appellant was handcuffed and seated on the couch.

Jackson picked up the knife and put it on a kitchenette table about 5 feet from appellant. He told his partner not to touch the knife because it would be held for fingerprinting. Shortly thereafter, appellant darted from the couch, grabbed the knife and threw it into some dishwater in the sink.

Fuji's shirt and T-shirt were found in the bedroom, both were stained in the abdominal region. A dry towel was found in the bedroom and a wet towel which appeared to contain blood stains in the bathroom sink. No additional blood stains were found on the bed or elsewhere in the apartment. Fuji's automobile was parked and locked outside the apartment. It also contained no signs of blood. Some beer cans were located on a kitchen sink. Neither the cans nor a coffee mug also found contained identifiable fingerprints.

The evidence showed that appellant and Fuji had rented the apartment on June 2, 1968, and that a homosexual relationship existed between Fuji and appellant and that appellant knew that Fuji usually returned to the apartment at about 7 p.m. on Saturdays. It also appeared that appellant slashed his left forearm while in jail on the night of his arrest and that a piece of a razor blade was subsequently found in his shoe.

Appellant testified in his own defense. He denied any knowledge of an assault upon Fuji. He said he had left the apartment in the morning and went to several bars where he "drank a lot of" beer, vodka, and wine. At one bar he met an acquaintance and the two of them returned to the apartment with some liquor and watched television. Appellant passed out around 4 while the acquaintance was still there. Appellant next remembered being wakened on the bed by Fuji who said, "Tommy, call an ambulance for me. Hurry." Fuji was holding one side and leaning across the bed.

Appellant also testified that he had been cutting his arm since he was 12 years old. He did not do it to kill himself, but that, "I just want to get out—when I get in a tight spot, locked up like that, I just can't stand it, that's all."

■ Appellant first contends that the acts of Officer Jackson of putting the knife on the table and stating that it would be wanted for possible latent prints "were a subtle form of queries" made after appellant stated that he wanted an attorney and that, therefore, the evidence that he threw the knife into the sink was inadmissible. There is no merit to this contention. The evidence is undisputed that no questions were asked of or directed to appellant. The court correctly found that appellant's actions were inde-

pendent of the *Miranda* requirements and that the fact that he jumped up and threw the knife into dishwater was admissible.

In *Miranda,* the Supreme Court stated: "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is *not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements* of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (Italics added.) (*Miranda* v. *Arizona,* 384 U.S. 436, 478 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602], [citation]; *People* v. *Powell,* 67 Cal.2d 32, 51 [59 Cal.Rptr. 817, 429 P.2d 137].) The California Supreme Court in *Powell* has made clear that the evil to which *Miranda* was directed was interrogation. (See also *People* v. *Chambers,* 276 Cal.App.2d 89 [80 Cal.Rptr. 672].) The court correctly found that appellant's actions were not the product of interrogation.

■ Appellant next argues that the trial court abused its discretion in allowing the testimony concerning the cutting of his arm on the night of his arrest. He argues that the rule of admissibility under the "consciousness of guilt" rule should "require that there be no other, or practically no other rationale for the act than a consciousness of guilt, *which is exemplified* by the subject conduct of the suspect."

■ That, however, is not the rule: "Any conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible. . . ." (*People* v. *Gryszkiewicz,* 88 Cal. App.2d 230, 235 [198 P.2d 585]; Cf. *People* v. *Perry,* 271 Cal.App.2d 84, 106 [76 Cal.Rptr. 725].)

■ Further, it is perfectly likely that the failure of counsel to object was based on a tactical consideration to have appellant testify to the frequency with which he had in the past slashed his arms, either to arouse sympathy or to create some excuse for throwing the knife into the dishwater. (Cf. *People* v. *Brooks,* 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383]; *People* v. *Perry, supra,* at p. 111; *People* v. *Ferguson,* 255 Cal. App.2d 493, 496 [63 Cal.Rptr. 93].)

Even assuming the evidence of the act should not have been admitted, appellant has shown no possible prejudice since he himself gave the jury a full explanation for his act.

■ Although not raised by appellant on appeal, our examination of

the record reveals that the jury was given the felony-murder instruction which has been condemned by our Supreme Court in *People* v. *Ireland,* 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580] and *People* v. *Wilson,* 1 Cal.3d 431, 437 [82 Cal.Rptr. 494, 462 P.2d 22].

The instruction given at bench was as follows: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, *the crime of assault with a deadly weapon,* and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree." (Italics added.)

"The specific intent to commit assault with a deadly weapon and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt."[1]  .

The pertinent part of the instruction condemned in *Ireland* and *Wilson* reads "that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases . . . (3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, *such as assault with a deadly weapon.*" (Italics added.)

The traditional rule governing homicides, particularly those involving an assault with a deadly weapon, when there is no showing of provocation or mitigation, was summarized in this court's decision in *People* v. *Jones,* 225 Cal.App.2d 598, 606 [37 Cal.Rptr. 454]: "When the killing is proved to have been committed by appellant *and nothing further is shown,* the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree. [Citation.] The burden of proving circumstances in mitigation is on the appellant. [Citations.] In addition, an assault with a dangerous weapon made in a manner to endanger life and resulting in death is sufficient to sustain a verdict of second degree murder. Malice is implied from the assault. [Citations.]" (Italics added.)

This rule is not in conflict with *Ireland* or *Wilson.* As noted by the

---

[1]We note that in the case at bench, the instruction was given before *Ireland* was decided. The same situation was also true in *Wilson,* however, and the *Ireland* rule was applied. The instructions were given on February 6, 1969. *Ireland,* decided on February 28, 1969, is retroactive.

emphasized language, the rule assumes that the accused *has maae no effort* to show facts in mitigation and *infers* the intent to kill from the deadly assault *without the aid* of the felony-murder rule. The vice condemned in *Ireland* is not the drawing of an inference of intent to kill from the assault with the deadly weapon but the *elimination* of the question to be decided by the trier of fact *of the effect* of evidence which shows mitigation or provocation.

At bench this is the very vice which is being exploited. There was substantial evidence, if believed, in mitigation which negated the ability of appellant to form or harbor malice and formulate the intent to kill. Appellant's defense was that he had been drinking over a period of hours, lapsed into sleep or unconsciousness and was awakened by the victim who was suffering from a knife wound that proved to be fatal. On such a record the fact that appellant in effect denied any assault or attempted to use unconsciousness at the time of the crime as an alibi, does not excuse the court by unambiguous instructions to give the jury an opportunity to determine whether appellant had the requisite malice aforethought and specific intent to warrant the conviction of second degree murder instead of some lesser degree of homicide. (Cf. *People* v. *Fain,* 70 Cal.App.2d 588, 598 [75 Cal.Rptr. 633, 451 P.2d 65].)

The felony-murder instruction is intended to and does relieve the jury of the necessity to make a specific finding of malice aforethought if a killing is caused by a defendant in the course of a dangerous assault or other dangerous felony. The court in *Ireland* notes, however, that the instruction is improper because it goes beyond any "rational function" that the felony-murder rule was intended to serve. (*Wilson,* p. 437.)

We note, too, that although *Ireland* and *Wilson* require reversal and the evidence appears to warrant it, there was no request for nor was any *sua sponte* instruction given on the subject of diminished capacity. At bench, the only instruction given which squints at diminished capacity was CALJIC 319 (revised) on voluntary intoxication.

The court noted in *Wilson* at pp. 440 and 437, respectively that "The [felony-murder] doctrine can serve its purpose [to deter felons from negligent or accidental killing] only when applied to a felony independent of the homicide" and "Properly understood, the instruction permitted the jury to find defendant guilty of second degree murder if they found only that the homicide was committed in the perpetration of the crime of assault

with a deadly weapon. (See *People* v. *Phillips* (1966) 64 Cal.2d 574, 584 and fn. 9 [51 Cal.Rptr. 225, 414 P.2d 353].)"

The judgment is reversed.

Herndon, J., and Fleming, J., concurred.