[Crim. No. 9879. Fourth Dist., Div. Two. Mar. 20, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY JOE LOPEZ, Defendant and Appellant.

712

**Counsel**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Aurelio Munoz and Richard A. Curtis, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**GARDNER, P. J.—**

### The Quandary

In this case we must determine whether the Supreme Court in *People* v. *Pettingill*, 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], has established an inflexible rule which has created an impenetrable barrier against *any* subsequent interrogation of an in-custody suspect after he has once invoked his *Miranda* rights. After an analysis of *Pettingill* and a consideration of the policy factors involved, we decline to read into *Pettingill* any such rigidly ritualistic dogma. Rather, we conclude that in *Pettingill* the Supreme Court has attempted to establish reasonable and flexible guidelines in order to accommodate the right of the individual to exercise his privilege against self-incrimination and society's interest in protecting itself through reasonably effective law enforcement procedures.

### The Case

Defendant was convicted by a jury of two counts of kidnaping, two counts of violation of Penal Code, § 288 and one count of violation of

Penal Code, § 288a. He was found to be a mentally disordered sex offender but not amenable to treatment. Sentenced to prison, he has appealed.

## THE CRIMES

On January 13, 1977, in the Bloomington area of San Bernardino County, the defendant dragged seven-year-old Michelle into his car. He drove to a secluded area, undressed her, laid on top of her, touched her vagina with his penis and compelled her to orally copulate him. When examined the next day, Michelle's hymen had been lacerated and her vagina abnormally dilated.

Nine months later, on October 27, 1977, in the City of Colton, also in San Bernardino County, the defendant dragged six-year-old Jessica into his car. He removed her clothing and molested her vaginal area to the extent that it caused pain and bleeding.

As we will note, the defendant confessed to both crimes.

At trial, his defense was an alibi, plus a disclaimer of his confessions.

We proceed to defendant's confessions. There is no issue as to their voluntariness. The only issue is compliance with *Miranda* as interpreted by *Pettingill* and its predecessor cases.

## THE INTERVIEW WITH OFFICER NUNEZ

On October 31, 1977, four days after the incident with Jessica, defendant was arrested by Officer Nunez of the Colton Police Department for the kidnaping of Jessica. At 12:15 p.m., he was given his *Miranda* admonition. He said, "If I'm going to get in trouble I would rather have a lawyer." At that time, Officer Nunez terminated any further conversation. The defendant was delivered to the San Bernardino County jail by a uniformed officer.

At the time of the interview, Officer Nunez was aware of the Michelle incident of nine months before. However, he did not discuss this with the defendant.

## THE INTERVIEW WITH DEPUTY JOHNSON

Immediately after the defendant was received at the San Bernardino County jail, a booking officer noticed that he resembled the described kidnaper in the Michelle incident of some nine months before. This booking officer called Deputy Johnson who had the Michelle incident in his portfolio of unsolved crimes. He too recognized certain similarities (tattoos) between the suspect in the Michelle case and the defendant. At about 1:40 p.m., he began to question the defendant about the area of his residence, his employment, his past criminal record and the type of car he owned. He advised the defendant that a crime had occurred 'n the Bloomington area (the Michelle incident) about a year before which was similar to the offense for which the defendant had just been arrested. He said he would like to talk about that incident. The defendant was agreeable. He waived his *Miranda* rights. Officer Johnson was unaware that the defendant had previously been given his *Miranda* rights and had declined to speak. After first denying any knowledge of the Michelle incident, he finally admitted he was the person who had kidnaped and molested Michelle.

Deputy Johnson was aware that the defendant had been arrested for the Colton incident. He said that the defendant had better talk to Officer Nunez about that arrest, since that incident came within the jurisdiction of the Colton Police Department. The defendant said that he did not want to talk to Nunez but that he would talk to Johnson. He then confessed to the Jessica kidnaping and molestation.

The court found compliance with *Miranda* and that the statement was free and voluntary.

### PETTINGILL

After the United States Supreme Court handed down *Miranda,* it became the task of other courts to implement the principles of that case as new and different factual situations developed.

In 1968, the California Supreme Court in *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], held that once an in-custody suspect has asserted his *Miranda* rights, continued questioning was forbidden even if the suspect subsequently receives and waives his *Miranda* rights. The court specifically did not disapprove of the use of statements voluntarily or spontaneously initiated by the suspect, citing *People* v.

*Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202]; and *People* v. *Treloar,* 64 Cal.2d 141 [49 Cal.Rptr. 100, 410 P.2d 620]. The so-called *Fioritto* rule was then followed in *People* v. *Enriquez,* 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261]; *People* v. *Disbrow,* 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Superior Court [Zolnay],* 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Carr,* 8 Cal.3d 287 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *Burton,* 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall,* 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]; and *People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. Then along came *People* v. *Pettingill, supra,* 21 Cal.3d 231.

The reason for *Pettingill* is readily apparent. In the meantime, the United States Supreme Court had decided *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], which reaffirmed *Miranda,* but rejected the *Fioritto* approach. Instead, the Supreme Court adopted a factual test turning on the circumstances of the renewed interrogation. " '. . . [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored" ' " (*Pettingill, supra,* p. 246.)

Our Supreme Court in *Pettingill* declined to follow *Michigan* v. *Mosley* and reaffirmed the *Fioritto* principle, doing so on the basis of the state Constitution—over the protest of the dissent that *Fioritto* and its progeny had all been based on federal constitutional grounds. However, the majority decided that the "comparatively inflexible *Fioritto* rule" (*Pettingill, supra,* fn. 12, p. 251) was to be the rule in California.

A cursory or casual reading of *Pettingill* without reference to its history, to its facts and to other existing case law might lead one to conclude that the *Fioritto* rule is to be taken as absolutely inflexible, i.e., when any suspect has been advised of his rights concerning any offense he may not later be approached by any other officer of any other agency concerning any other offense with the intent to readmonish him and, with his permission, interrogate him. We do not so read or interpret *Pettingill.* Such an interpretation would have some absurd and unintentional results. As the United States Supreme Court said in *Michigan* v. *Mosley, supra,* 423 U.S. 96, at page 102 [46 L.Ed.2d 313 at page 320], ". . . a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irra-

tional obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests."

A blanket proscription of *any* renewed questioning under *any* circumstances would lead to the following absurd results.

Item: A defendant is taken into custody on a charge of robbery. He declines to waive his *Miranda* rights when arrested. Six days or six months or six years later, while still in custody, he kills a guard or a fellow inmate. The officers cannot initiate any questioning of the defendant concerning the killing.

Item: A defendant is arrested for vagrancy and declines to talk. While in custody probable cause develops which indicates that he is the Hillside Strangler. The officers cannot ask him if he is perchance that individual.

Item: A defendant is in custody on a minor misdemeanor. When arrested, he declines to talk. While still in custody, it develops that he is part of a conspiracy to assassinate the President of the United States. However, any inquiry into this rather interesting subject is foreclosed.

A rigid, inflexible approach to *Fioritto* in any of the above cases would not only be unreasonable and absurd, it would, in the language of *Michigan* v. *Mosley, supra,* 423 U.S. 96, at page 102 [46 L.Ed.2d 313 at page 320], ". . . transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, . . ." We decline to attribute to the Supreme Court of this state any such intent.

The obvious purpose of *Pettingill* was to divorce the law of this state from the uncertainty and the lack of objective standards under the "scrupulously honored" test of *Michigan* v. *Mosley.* However, in so doing, *Pettingill* left intact a considerable body of case law which had adopted a somewhat less than rigid approach to *Fioritto.*

Pettingill's facts must be examined. In *Pettingill,* the defendant was arrested at the scene of a burglary in Eureka. After being advised of his *Miranda* rights, he *twice* refused to talk to the police. Two days later, a police officer from Santa Barbara *with knowledge* that the defendant had previously refused to talk to the Eureka police, after readmonishing him of his *Miranda* rights, again interrogated him, this time about another crime in another city. Obviously, police harassment existed. The officers

were going to interrogate Mr. Pettingill come hell or high water. There was an obvious violation of the principles of *Fioritto*. Under these circumstances, the court held, "Little would remain of the *Fioritto* rule (*People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]) if it could be evaded simply by sending in an officer from a different police or sheriff's department every time a suspect asserts his right to remain silent, or by changing the subject of the questioning from one of the crimes under investigation to another. We cannot countenance such a drastic dilution of the effectiveness of the *Fioritto* rule in protecting the rights of California citizens." (*Pettingill, supra,* at p. 245.)

It is true that the court stated that mere passage of time and the substitution of new police officers and a new crime were "not relevant to the purposes sought to be served by *Fioritto* and its progeny." (*Pettingill, supra,* p. 242.) However, that statement must be read in connection with the facts in *Pettingill.*

*Pettingill* noted the existence of factual situations which even under *Fioritto* avoid an inflexible application of the rule of that case. In *Pettingill,* at page 251, footnote 12, the court said, "Even in applying the comparatively inflexible *Fioritto* rule under present law, the courts have sometimes reached contrary conclusions on admissibility that are difficult to justify in terms of the factual differences between the cases. (Compare, e.g., *People* v. *Miller* (1974) 40 Cal.App.3d 228 [114 Cal.Rptr. 779] (per Thompson, J.), with *People* v. *Parker* (1975) 45 Cal.App.3d 24 [119 Cal.Rptr. 49] (same).) We have no doubt that such discrepancies would be far more frequent under *Mosley.*"

In *Miller,* the defendant was apprehended at the scene of a burglary. He was given his *Miranda* rights and declined to waive them. Two days later, he was again in much greater detail advised of his *Miranda* rights. He was then asked several questions concerning them and agreed to talk. The court concluded that the broad rule of *Fioritto* had been limited essentially to situations in which on balance the court could conclude that, given the combination of circumstances existing, the defendant had freely, knowingly and intentionally elected to speak without counsel at the second interrogation. *Miller* noted that factors to be considered in determining whether *Fioritto* had been complied with were (1) the period of time intervening after questioning is first terminated (*People* v. *Chambers,* 276 Cal.App.2d 89 [80 Cal.Rptr. 672]; *People* v. *Duran,* 269 Cal.App.2d 112 [74 Cal.Rptr. 459]); (2) whether the subsequent interrogation is initiated by the police solely to obtain a statement or is also

motivated by outside factors (*People* v. *Chambers, supra*); (3) the extent of subsequent warning and explanation of rights before a second questioning commences (*People* v. *Brockman,* 2 Cal.App.3d 1002 [83 Cal.Rptr. 70]; *People* v. *Smith,* 270 Cal.App.2d 715 [76 Cal.Rptr. 53]); (4) whether police conduct involves only reinstituted questioning or also includes an inducement to confess, albeit, a proper one; and (5) the circumstances under which the first warning of *Miranda* rights was given and the rights asserted (*People* v. *Miller, supra,* 40 Cal.App.3d 228, 231).

In *People* v. *Lyons,* 18 Cal.App.3d 760 [96 Cal.Rptr. 76], the court upheld a second interrogation in which a defendant had first been arrested on a Penal Code, section 647, subdivision (i) charge and declined to talk about that charge. He was subsequently interrogated on a robbery charge. The court noted that there was no evidence that his arrest on the misdemeanor charge was a subterfuge, that the officer who arrested him on the misdemeanor had no knowledge that he was implicated in a robbery and that the officer who interrogated him on the robbery had no knowledge that the defendant had refused to discuss the unlawful lodging charge after a *Miranda* advisement. The court noted the total absence of any coercive police tactics and approved the second interrogation noting that it was important to proper law enforcement that the police be able to ascertain at the earliest possible moment whether their attention is being directed at the wrong person and that it may be equally important to the suspect who may be perfectly willing to discuss the subsequently discovered charge or may even have an alibi or other defense which prompt inquiry could establish.

We deem it of more than passing interest that the Supreme Court did not disapprove of *Miller, Duran, Chambers, Smith, Brockman* or *Lyons* or other cases in the considerable library which has followed the *Miller* rationale, i.e., an approach to *Fioritto* which does not transfer that case to "something wholly irrational."

## The Decision

■ We hold that under a reasonable application of the doctrine of *Fioritto/Pettingill,* the decision of the trial court to admit these confessions should be upheld. We note the following factors in making this determination.

(1) There was no "continued" questioning of the type forbidden by *Fioritto.* There was a brief colloquy in the Colton Police Department

which terminated when the defendant chose to exercise his *Miranda* rights. Over an hour later, a nonrelated conversation took place in the San Bernardino County jail with another officer on another subject.

(2) There is no indication of any police subterfuge. The arrest by Nunez for the Jessica incident was totally unrelated to the interrogation by Johnson of the Michelle incident. It was only the happenstance that an alert booking clerk noted the similarity in the defendant's appearance that caused Johnson to commence his interrogation.

(3) The second interview was in no way a reinstitution of the prior conversation.

(4) The subsequent *Miranda* warning was full, exact, accurate and proper.

(5) Officer Johnson had no idea whatsoever that the defendant had previously exercised his *Miranda* rights with Officer Nunez. The defendant says this is immaterial, citing *People* v. *Randall, supra,* 1 Cal.3d 948; *People* v. *Ireland, supra,* 70 Cal.2d 522.

It is true that *Ireland* and *Randall* frown on ignorance of the second officer of a prior invocation of *Miranda* rights as an escape hatch from the principles of *Fioritto*. However, again, the footnotes which express this concept (fn. 12 in *Ireland* at p. 537; and fn. 10 in *Randall* at p. 957) must be examined in the light of the facts in those cases.

In *Ireland,* the defendant asked to "call my parents for an attorney" while in a police car. He was then placed in an interrogation room when he arrived at the police station. His inquiries as to his status were rebuffed as were his efforts to avail himself of his privilege against self-incrimination. All of these ". . . had absolutely no effect upon the continued functioning of that machinery (of custodial interrogation)." The court could not excuse the behavior of the officers through some "failure to communicate within the police department" simply because a subsequent interrogating officer had no notice of the defendant's statement in the police car.

In *Randall,* the defendant had made a request to call his attorney. The interrogating officer who testified said he was not present when the request was made. The court observed that at least two members of the sheriff's department knew of the call and that one of these participated in the subsequent interrogation.

Thus, in *Ireland* and *Randall,* we have clear cut evidence of police harassment and a definite intent to avoid *Fioritto.* Nothing in that case exists in the instant case. We deem that the lack of knowledge on the part of Officer Johnson that a prior warning had been given *is* a factor to be considered.

(6) Actually, the record would support a finding that the refusal of the defendant to talk to Nunez was a matter of personal dislike or a personality clash between himself and that officer, rather than a sincere desire to exercise his privilege against self-incrimination. The defendant simply did not want to talk to Nunez, refused to do so, but was perfectly willing to talk to Johnson.

When we consider all of the above factors and attribute to the authors of *Pettingill* an attempt to formulate a standard based upon reason and common sense, we conclude that substantial evidence supports the trial court's finding that there was no violation of the defendant's right against self-incrimination in his statement to Officer Johnson.[1]

### PENAL CODE SECTION 654

The trial court sentenced the defendant to consecutive terms for the violation of Penal Code sections 288 and 288a of Michelle, but made a finding that Penal Code section 654 prohibited imposition of a sentence for kidnaping. Accordingly, sentence on that count was stayed. (*People* v. *Niles,* 227 Cal.App.2d 749 [39 Cal.Rptr. 11].)

Defendant contends that the court erred in the consecutive sentences on the 288 and 288a convictions.

■ Multiple sex crimes against the same victim during the same incident may be separately punished. (*People* v. *Perez,* 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63]; *People* v. *Hicks,* 63 Cal.2d 764 [48 Cal.Rptr. 139, 408 P.2d 747]; *People* v. *Slobodion,* 31 Cal.2d 555 [191 P.2d 1].)

Judgment affirmed.

Morris, J., and Kneeland, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 17, 1979. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.

---

[1]If we were to adopt a rigid, inflexible interpretation of *Pettingill,* police officers would have to add a new sentence to their *Miranda* warning. "Have you ever exercised your *Miranda* rights in the past and, if so, when, where and to whom?"

*Assigned by the Chairperson of the Judicial Council.