[Crim. No. 12163. In Bank. Dec. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
RUFUS WILSON, Defendant and Appellant.

**COUNSEL**

Robert L. Lieff, under appointment by the Supreme Court, and Belli, Ashe, Ellison, Choulos, Cone & Harper for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant Rufus Wilson was charged with the first degree murders of his wife and William Washington, and assaults with a deadly weapon with intent to murder Lewis Champion and Joe Stoglin. On April 13, 1965, after a jury trial, defendant was found guilty as charged in the two murder counts and the assault upon Stoglin, and guilty of assault with a deadly weapon, a lesser included offense, in the assault upon Champion. The penalty for the two murder convictions was fixed at death. We reversed the murder convictions and the conviction of assault with a deadly weapon on the basis of errors in the instructions, and we affirmed the conviction of assault with a deadly weapon with intent to murder Joe Stoglin. (*People v. Wilson* (1967) 66 Cal.2d 749 [59 Cal.Rptr. 156, 427 P.2d 820].) Upon retrial, a jury found defendant guilty of murder in the first degree of his wife, murder in the second degree of Washington, and assault with a deadly weapon upon Champion. The jury fixed the penalty for the murder of defendant's wife at death; this appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Prior to the events resulting in the convictions in the instant proceedings, defendant had no criminal record. He was 43 years of age and had worked for the preceding 19 years as a forklift operator for a Los Angeles firm. He was married to Ann Wilson for nine years, but she left him in January 1964 and filed for divorce. After their separation defendant attempted to effect a reconciliation and occasionally they met or talked on the telephone.

The prosecution's evidence may be summarized as follows: About 10:30 p.m. on October 14, 1964, Lewis Champion, Joe Stoglin, and William Washington accompanied defendant's wife to her apartment where they ate some food and watched television. Stoglin and Washington fell asleep in the living room, while Champion continued to watch television. There were several telephone calls within the next hour which were answerd by Mrs. Wilson. Champion answered a later call from defendant, but Mrs. Wilson

told him to hang up. Champion told defendant that his wife was in the bathroom and defendant hung up. Champion denied saying anything further to defendant.

A few minutes later Champion saw automobile lights shining in the driveway to the apartment and immediately thereafter heard the sound of breaking glass from the window on the door at the bottom of the stairs of the building. Mrs. Wilson ran to a bedroom phone and called the police. She threw a pistol down on the bed along with some bullets, but the bullets were too small and Champion was unable to load the pistol. Defendant broke into the apartment with a shotgun in his hand and pointed it at Champion, who dropped his gun and put up his hands.

Champion pleaded that he did not know why defendant had come, but that he had nothing to do with the situation. Defendant said, "All right, let's go." Champion pulled the sleeping Stoglin off the couch, and they left the apartment and started down the stairs. Champion rushed out of the building and fled. Stoglin, who had followed Champion, was shot and wounded as he descended the stairs.[1]

A neighbor who lived in the adjoining apartment heard glass shatter, the sound of someone running up the stairs, the splintering of the door to the Wilson apartment, a shot followed by a female scream, and then, several seconds later, five or six shots. She then heard someone slowly descending the stairs and someone say, "Sorry it had to end like this." When she looked out the window a moment later, she saw a truck quickly backing out of the driveway. Other neighbors also heard shots, and saw Stoglin fall down the stairs and lie at the base of the stairway. After two more shots, they saw Washington come down the stairs, stumble over Stoglin and fall behind a bush beside the driveway.

Before defendant had gone two blocks, a police car arrived at the scene of the shooting in response to a radio call, and the officers pursued defendant and stopped him about three blocks from Mrs. Wilson's apartment. One of the officers had defendant put his hands on the wall of a building and searched him for weapons, but found none. In accordance with information supplied by defendant, a shotgun and shell were found in the truck bed. Defendant's hand was bleeding, and there was blood on the gun and his clothing.

Defendant was placed under arrest. He was told that he had the right to remain silent and the right to presence of an attorney before making any

---

[1]The foregoing evidence as to the events in Mrs. Wilson's apartment is taken from Champion's testimony. Stoglin moved to Arizona prior to the first trial and did not testify.

statements and that any statements he made could be used against him at future criminal proceedings. After defendant was handcuffed, he stated in response to questions by an officer that the shotgun belonged to him, that he had talked to his wife about an hour earlier, that a male voice had interrupted and told him to get lost and leave her alone, that he loaded the shotgun and went to his wife's apartment, that he broke into the apartment, saw three males and one female and shot at them, that one of the males pleaded with him not to shoot and that he let him pass by. Defendant also stated that he was a good shot with the shotgun and used it rather than an automatic because he could shoot more accurately at close range, and that had he known there was another shell in the truck, he would have used that one too.

Other police officers arrived at Mrs. Wilson's apartment and found Washington lying on the lawn underneath a bush and Stoglin lying in front of the door. Stoglin had a gunshot wound in the back; there was expert testimony that Stoglin was shot from a distance of 10 to 15 feet. An autopsy revealed that Washington suffered three wounds, in the left forearm, the upper chest, and the middle of the back. He died after surgery the day following the shooting.

The officers, in entering the apartment, found the front door open. The bathroom door had two holes caused by shotgun blasts; it was off its hinges and leaning into the bathroom. Three shells were found near the front door of the apartment and three near the bathroom door. Mrs. Wilson, fully clothed, was lying in the bathtub. She had a wound in the upper chest area surrounded by a large bloodstain. There was expert testimony that the muzzle of the shotgun had been about six or eight inches from her chest when fired.

Defendant's testimony may be summarized as follows: During the 10-month period of separation, he saw his wife on occasion and talked to her on the telephone. He asked her to come back to him, and she said she would think about it. He took her out, and he was still in love with her.

On the evening of the shooting he was playing cards with his landlady and two other persons. While he was playing, his wife called and told him that she was giving a party for him and invited him to her apartment. He asked who was going to be at the party, and she said some friends would attend. Defendant said she should give the party for her friends and hung up. He resumed the card game, and his wife telephoned again, asking when he was coming over. He told her he was not going to come, and she asked what he was doing. He replied that he was playing cards, and she retorted that he must like the card game better than he liked her. He hung up.

The card game ended when a sailor arrived to rent a room for the night.

Defendant helped his landlady prepare the room, and later drove to a store to purchase some cigarettes. As defendant was parking in front of his apartment, a man in a car spoke to him and asked whether he was coming to the party. Defendant said he was not. The man threw his hat into the driveway and said, "When you come over, bring it with you." Defendant replied, "I don't have any beef with you fellows. I don't even know you." The man and another person in the car drove away, and defendant re-entered his apartment house and had a beer.

Sometime later, defendant told his landlady he had been threatened, and used her telephone to call his wife. A man answered who swore at him and refused to permit him to speak to his wife. The man said he had "gotten rid" of Mrs. Wilson for the night and was waiting for defendant. The man hung up. Defendant did not recognize the man's voice. Defendant took his loaded gun from the closet and decided to go to his wife's apartment "to give those fellows who had been giving me a bad time, just to scare them, that is all."

When defendant arrived at his wife's apartment, he found the outside door to the building locked. He returned to his truck for tools with which to open the door, and, remembering that he had the gun with him, took the gun and used the stock to break a glass window in the door. He reached through the glass and unlatched the door, cutting his hand in the process.

Defendant ascended the stairs, opened the door to the apartment, and saw Champion and Stoglin. After permitting them to leave, he watched them go down the stairs and saw Stoglin stop halfway down. Having already observed Champion with a gun when he entered, defendant thought Stoglin was reaching for a gun. Defendant fired once.

The next thing that defendant recalled was being stopped by police officers. He did not remember the statements he made to the officers. It was at this time he first realized he cut his hand. Defendant did not intend to shoot anyone when he went to his wife's apartment; he only intended to scare them. He did not know that his wife was in the apartment.

At the first trial defendant testified that after he shot Stoglin, he saw Washington get up and come "right at me." He did not recall shooting Washington. At the second trial, he claimed no recollection of seeing Washington and the transcript of the earlier trial did not refresh his memory.

At the penalty trial, defendant presented testimony by 10 fellow em-ployees, some of whom knew defendant socially, his superior, the company personnel manager, and a company officer. They agreed that defendant was a good worker, always pleasant and friendly, intelligent, and a nice person who had never been known to engage in arguments or fights. It was

stipulated that the Catholic chaplain at San Quentin would testify that defendant, whom he visited often, seemed sincere when expressing that he was sorry about the incident and that it was not his nature to be violent toward people. It was the chaplain's opinion that defendant could be rehabilitated.

It was also stipulated that the supervising sergeant at San Quentin would testify that defendant gave him no problems whatsoever, that he adjusted well to all the inmates and guards, that he cooperated with the officers as to the location of a weapon after an assault, that the sergeant, to protect defendant's life, had not mentioned the incident to anyone at San Quentin, and that it was his opinion that defendant was the "best behaved inmate" he had ever had on death row.

■ The jury were instructed on a verdict of second degree murder in relevant part as follows: "[T]he unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . (3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon." This instruction was prejudicial error and requires reversal of defendant's conviction of the second degree murder of Washington.

Properly understood, the instruction permitted the jury to find defendant guilty of second degree murder if they found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. (See *People* v. *Phillips* (1966) 64 Cal.2d 574, 584 and fn. 9 [51 Cal.Rptr. 225, 414 P.2d 353].) The instruction is intended to relieve the jury of the necessity to make a specific finding of malice aforethought if a killing is caused by a defendant in the course of a felonious assault or other dangerous felony.

In our recent decision of *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], we held an identical instruction to be improper on the ground that it went beyond any "rational function" that the felony-murder rule was intended to serve. "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the

prosecution shows to be an offense included in fact within the offense charged." (Fn. omitted.) (*Id.* at p. 750.)

The instruction given in this case allowed the jury to return a verdict of second degree murder if they found that Washington was killed in the course of defendant's perpetration of an assault with a deadly weapon upon Washington. Thus, the felony-murder instruction was based on an underlying felony which was a necessary ingredient of the homicide, and converted the homicide automatically into second degree murder on a finding of the underlying felony. This "bootstrapping" was erroneous in *Ireland* and is erroneous here.

The error was clearly prejudicial in that it permitted a conviction of second degree murder without a finding of the essential element of malice aforethought. Furthermore, the faulty conviction of defendant on the second degree murder charge involving Washington may have influenced the jury in its deliberations on the death penalty for the wife's murder and could necessitate a new penalty trial. ■ However, this question is mooted by the necessity of our reversing defendant's conviction of first degree murder for the killing of his wife.

The following instructions among others were given to the jury relevant to a verdict of first degree murder:

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate burglary, is murder of the first degree, and all other kinds of murder are of the second degree."

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which is committed in the perpetration or attempt to perpetrate burglary, the commission of which crime itself must be proved beyond a reasonable doubt, is murder of the first degree."

"Every person who enters any house, room, apartment, tenement, or other building, with intent to unlawfully steal, take and carry away the personal property of another of any value or to commit any felony is guilty of burglary. The essence of a burglary is entering a place such as I have mentioned with such specific intent; and the crime is complete as soon as the entry is made, regardless of whether the intent thereafter is carried out."

"An assault with a deadly weapon is an unlawful attempt, coupled with a present ability, to commit a violent injury upon the person of another with a deadly weapon. . . .

"To constitute an assault with a deadly weapon, actual injury need not

be caused. The characteristic and necessary elements of the offense are the unlawful attempt, with criminal intent, to commit a violent injury upon the person of another, the use of a deadly weapon in that attempt, and the then present ability to accomplish the injury. . . .

"Assault with a deadly weapon is a felony."

The clear purport of these instructions as applied to the present case is that if defendant entered his wife's apartment or any room thereof with an intent to commit an assault with a deadly weapon, he was guilty of burglary; and if in the course of such burglary he killed his wife and/or Washington, such killing was first degree murder, whether it was intentional, negligent, or accidental.

The jury could not have found that defendant entered his wife's apartment with an intent to commit an assault with a deadly weapon, or they would have been compelled to fix the degree of the Washington murder at first degree. The second degree verdict for the killing of the latter must have been based either on a finding that defendant killed him intentionally without premeditation, or that defendant killed him in the course of an assault upon him. The first degree conviction for the killing of Mrs. Wilson must, therefore, have been based either on a finding that (1) defendant developed the necessary premeditation in the few seconds between the killing of Washington in the living room and the killing of Mrs. Wilson in the bathroom, or that (2) he entered the bathroom with an intent to commit an assault with a deadly weapon and thereby committed a burglary, in the course of which he killed his wife and thus committed first degree felony murder. Because the instructions permit this latter course of reasoning by the jury, we must reverse defendant's conviction.[2]

In *People* v. *Ireland* (1969) *supra,* 70 Cal.2d 522, 539-541, this court expressly declined to reach the question of the validity of first degree felony-murder instructions identical to those given in the case at hand: "Finally, we note that two decisions of this court dealing with the related question of first degree felony murder have indicated that the limitation recognized in New York [see discussion of the New York "merger" doctrine

---

[2]The prosecutor argued to the jury the full range of applicable first degree felony-murder theories—burglary of the outer glass door of the building, burglary of the door to the apartment itself, and burglary of the bathroom. However, he emphasized the burglary of the bathroom theory: "[N]o matter what you think about what the defendant's intentions were when he broke through the glass door and when he broke through the door to the entrance to the apartment, . . . [t]here is only one intention demonstrated by the evidence here as far as Mr. Wilson is concerned when he placed the muzzle of that shotgun against the [bathroom] door and fired two shots through it, and that is, he intended to commit an assault with a deadly weapon upon the person inside that room . . . . ."

cases, *post*] is not to be applied in this jurisdiction to preclude a first degree felony-murder instruction based upon a burglary as to which the intended felony is the homicide itself or an offense included therein. (*People* v. *Hamilton* (1961) 55 Cal.2d 881, 901 [13 Cal.Rptr. 649, 362 P.2d 473]; *People* v. *Talbot* (1966) 64 Cal.2d 691, 703 [51 Cal.Rptr. 417, 414 P.2d 633].) Although we express no present opinion upon the question specifically considered in those cases, we must overrule them to the extent that they contain reasoning or language inconsistent with the instant opinion."

While the *Ireland* court necessarily limited its ruling to the case before it, we find that the reasoning and the language of that decision are applicable to the case at bar. Here the prosecution sought to apply the felony-murder rule on the theory that the homicide occurred in the course of a burglary, but the only basis for finding a felonious entry is the intent to commit an assault with a deadly weapon. When, as here, the entry would be nonfelonious but for the intent to commit the assault, and the assault is an integral part of the homicide and is included in fact in the offense charged, utilization of the felony-murder rule extends that doctrine "beyond any rational function that it is designed to serve." We have heretofore emphasized "that the felony-murder doctrine expresses a highly artificial concept that deserves no extension beyond its required application." (*People* v. *Phillips* (1966) *supra*, 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353].)

■ "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) Where a person enters a building with an intent to assault his victim with a deadly weapon, he is not deterred by the felony-murder rule. That doctrine can serve its purpose only when applied to a felony independent of the homicide. In *Ireland,* we reasoned that a man assaulting another with a deadly weapon could not be deterred by the second degree felony-murder rule, since the assault was an integral part of the homicide. Here, the only distinction is that the assault and homicide occurred inside a dwelling so that the underlying felony is burglary based on an intention to assault with a deadly weapon, rather than simply assault with a deadly weapon.

We do not suggest that no relevant differences exist between crimes committed inside and outside dwellings. We have often recognized that persons within dwellings are in greater peril from intruders bent on stealing or engaging in other felonious conduct. (See, e.g., *People* v. *Talbot* (1966) *supra*, 64 Cal.2d 691, 703 [51 Cal.Rptr. 417, 414 P.2d 633].) Persons within dwellings are more likely to resist and less likely to be able to avoid the consequences of crimes committed inside their homes. However, this

rationale does not justify application of the felony-murder rule to the case at bar. Where the intended felony of the burglar is an assault with a deadly weapon, the likelihood of homicide from the lethal weapon is not significantly increased by the site of the assault. Furthermore, the burglary statute in this state includes within its definition numerous structures other than dwellings as to which there can be no conceivable basis for distinguishing between an assault with a deadly weapon outdoors and a burglary in which the felonious intent is solely to assault with a deadly weapon.[3]

In *Ireland,* we rejected the bootstrap reasoning involved in taking an element of a homicide and using it as the underlying felony in a second degree felony-murder instruction. We conclude that the same bootstrapping is involved in instructing a jury that the intent to assault makes the entry burglary and that the burglary raises the homicide resulting from the assault to first degree murder without proof of malice aforethought and premeditation. To hold otherwise, we would have to declare that because burglary is not technically a lesser offense included within a charge of murder, burglary constitutes an independent felony which can support a felony-murder instruction. However, in *Ireland* itself we did not assert that assault with a deadly weapon was a lesser included offense in murder; we asserted only that it was "included in fact" in the charge of murder, in that the elements of the assault were necessary elements in the homicide. (70 Cal.2d at p. 539 and fn. 14.) In the same sense, a burglary based on intent to assault with a deadly weapon is included in fact within a charge of murder, and cannot support a felony-murder instruction.

We recognize that *Ireland* dealt with a court-made rule while this case involves first degree felony murder, which is statutory.[4] However, the statutory source of the rule does not compel us to apply it in disregard of logic and reason. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) Indeed, a literal interpretation of section 189 would have limited the felony-murder doctrine to the role of converting all "murder" committed in the course of the perpetration of the named felonies to first degree murder. Instead, we have more

---

[3]Included are any "shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, trailer coach . . ., vehicle . . ., aircraft . . ., mine or any underground portion thereof . . . ." (Pen. Code, § 459.)

[4]Penal Code section 189 provides that "All murder . . . which is committed in the perpetration or attempt to perpetrate . . . burglary . . . is murder of the first degree . . . ."

broadly interpreted the word "murder" to mean "homicide" or "killings," so that the elements of the crime of murder need not be proved under the felony-murder doctrine. (See *People* v. *Washington* (1965) *supra,* 62 Cal.2d 777, 780-781 [44 Cal.Rptr. 442, 402 P.2d 130].)

Furthermore, other jurisdictions which have adopted the so-called merger doctrine[5] have done so in the face of similar statutes codifying the felony-murder rule. (See, e.g., *People* v. *Moran* (1927) 246 N.Y. 100 [158 N.E. 35]; *People* v. *Wagner* (1927) 245 N.Y. 143 [156 N.E. 644]; *People* v. *Huther* (1906) 184 N.Y. 237 [77 N.E. 6]; *State* v. *Severns* (1944) 158 Kan. 453 [148 P.2d 488]; *State* v. *Branch* (1966) 244 Ore. 97 [415 P.2d 766].) For example, in New York the statute provided that the killing of a person without design to effect death was first degree murder if committed by one engaged in the perpetration of *any felony.* Nevertheless, the New York courts have interpreted that language to include only felonies independent of the homicide, which do not merge therein. In *Ireland,* we adopted the reasoning underlying the merger doctrine. (70 Cal.2d at p. 540.)

 Holding as we do that an instruction on first degree felony murder is improper when the underlying felony is burglary based upon an intention to assault the victim of the homicide with a deadly weapon, it is necessary to overrule, insofar as inconsistent herewith, two decisions which previously approved an identical instruction. (*People* v. *Hamilton* (1961) *supra,* 55 Cal.2d 881, 901; and *People* v. *Talbot* (1966) *supra,* 64 Cal.2d. 691, 703.) A reading of *Ireland* contrasted with the text in *Hamilton* makes this result inevitable.[6] This court in *Hamilton* conceded that the merger doctrine followed in New York would require an independent felony to support a felony-murder instruction and that burglary based on an intent to assault the victim of the homicide was generally not such a felony (55 Cal.2d at p. 901), but it simply hesitated to adopt that line of authority. In *Ireland,* we overruled language in *Hamilton* and *Talbot* which rejected the New York merger doctrine, and we approved the rule in cases originating in New York and other jurisdictions. (70 Cal.2d at pp. 539-540.) We therefore adhere to the more recent *Ireland* rationale.

---

[5]"Merger" refers to the concept that only felonies independent of the homicide can support a felony-murder instruction; felonies that are an integral part of the homicide are *merged* in the homicide.

[6]*Talbot* relied entirely on language in *Hamilton* on this point and, therefore, we need only be concerned with *Hamilton.*

The judgment convicting defendant of first and second degree murder is reversed; it is affirmed insofar as it convicts him of assault with a deadly weapon.

Traynor, C.J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment in its entirety. (See Cal. Const., art. VI, § 13.)

Respondent's petition for a rehearing was denied January 14, 1970. McComb, J., was of the opinion that the petition should be granted.