No. 50,465

STATE OF KANSAS, *Appellee,* v. JOHN L. RUPE, *Appellant.*

(601 P.2d 675)

Opinion filed October 27, 1979.

*Joseph L. Dioszeghy,* of Lenexa, argued the cause and was on the brief for the appellant.

*Michael B. Buser,* assistant district attorney, argued the cause and *Robert T. Stephan,* attorney general, and *Dennis W. Moore,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Following a jury trial defendant-appellant, John L.

Rupe, was convicted of first degree felony murder (K.S.A. 21-3401) and of aggravated burglary (K.S.A. 21-3716). After denial of his motion for a new trial and sentencing on both counts, defendant appeals from the convictions and sentences. He specifies three points of error.

There is little dispute in the facts presented. Defendant and Martha L. Locke, the victim, had been involved in a rocky, unstable relationship for a number of years. Some of their problems stemmed from defendant's heavy drinking. Apparently defendant and Martha had been twice married and divorced and had lived together intermittently at other times. At the time of the events in question, defendant was residing with his parents. According to defendant's own testimony he left a bar where he had been drinking about 12:30 a.m. on February 3, 1978, went to his parents' residence and left a note which read:

"Mom and Dad, I love you. I just can't get it together. Please forgive me. I love Marty and I can't get it together. I'm sorry I have to die this way, but Jesus loves me."

Defendant then removed two firearms, a loaded shotgun and a loaded .22 caliber rifle and a sizable quantity of ammunition from a gun cabinet. He then drove to the residence of Martha Locke. Upon arriving there, defendant wrapped a coat around his hand, shattered the basement window and entered the basement carrying both of the firearms and the ammunition. Defendant left the shotgun in the basement, went upstairs into the garage and forcibly kicked in the door leading into the hallway of the home. Upon entering the home defendant observed Martha Locke on the telephone.

At trial, defendant testified that the following then occurred:

"Marty was standing there, and like I don't remember pulling the trigger, but something startled me; I guess it was the sound of the gun going off. And then, like Marty didn't fall or anything. She just stood there, you know. And I didn't even know I hit her, and that's when I just grabbed all the shells out and threw them on the table, and I loaded the gun. I was going to kill myself. I just got—you know, I got the shell in the gun. That's when Marty put her arms out towards me. Marty, I think she dropped the phone, and—she just—she put her arms out and stepped towards me, and I dropped the gun, and I started to walk to her, and I got right to her and she fell down like on her knee, and I put my arm underneath her, and I told her I loved her, and I walked her over to—to the icebox, and we sat down right at the icebox and—"

There was testimony by arresting officers that defendant had

made statements shortly after his arrest which contradicted his testimony at trial.

Evidence at trial fixed the time of the killing at about 4:00 a.m. There was also evidence that Martha had been forewarned about a visit from defendant by defendant's AA counselor and was talking to the police on the telephone at the time defendant entered the house. In this connection Thomas Wilkes, a dispatcher for the Olathe Police Department testified that at 4:07 a.m. on February 3rd he received a call from a woman who seemed hysterical and told him to send police to an address on Elizabeth and then after a short pause he heard the woman say, "Oh, my god, please, please don't shoot me." Wilkes next heard a loud hollow sound "like the phone receiver dropping and banging on the floor." Wilkes got no further response and soon heard the connection broken as though "the receiver was hung up from the other end."

Wilkes dispatched police to the address given. Olathe police officers Howard Kannady and James Pike arrived at the murder scene shortly thereafter. After the officers knocked several times and rang the doorbell, defendant opened the door and surrendered to the officers. Officer Pike testified that he asked defendant what was going on and defendant replied that "he and his wife had been separated and that he couldn't handle the situation any longer, so he shot her." Another officer, Patrolman Salmon, who arrived a few minutes later, testified that after he read *Miranda* rights, defendant told him that he just wanted to talk to his wife, but she wouldn't listen.

Debbie Ann Patterson, the fourteen-year-old daughter of Martha Locke, testified that she was awakened by the noise of a basement window breaking and a banging noise on the garage door. As to the actual killing, Debbie testified, "I saw him go up the stairs, and I heard my mom say 'God, oh, no,' and then I heard something that sounded like a gun." She further testified that she heard defendant talking, "He said how much he loved her and that—he said that about five times, and then he said he was going to kill us all."

The thrust of the defense at trial was insanity and lack of intent. Dr. Claude J. Werth, a psychiatrist, was called by defendant as a witness. Dr. Werth testified that defendant was most definitely susceptible to episodes of rage and extremely explosive, but that

in his medical opinion defendant had the capacity to premeditate, to plan and design the killing of Martha, and that at the time of the killing defendant knew what he was doing and could distinguish right from wrong.

In his first claim of error on appeal defendant contends the trial court erred in admitting evidence of a prior incident of violence between defendant and Martha. The evidence in question consisted of the testimony of Debbie Ann Patterson, the victim's daughter, describing a violent clash between defendant and Martha that occurred in Martha's home in late December, 1977, about forty or forty-five days before the homicide.

During the course of the State's case, the trial court, on request of the State, conducted an evidentiary hearing outside the presence of the jury to consider the State's motion to present the evidence in question. The hearing was conducted in conformance with K.S.A. 60-455 and *State v. Bly*, 215 Kan. 168, 523 P.2d 397 (1974), for the purpose of proving intent. Debbie Ann testified in substance that shortly after defendant arrived on the day in question she saw him choking her mother and shaking her with his hands around her neck. Debbie testified that she screamed and tried to get defendant to stop; failing in this she "got out the front door . . . ran across the street and called the police."

The trial court admitted the evidence under the intent exception to K.S.A. 60-455 and gave the proper limiting instruction.

Before the trial court defendant argued the evidence was inadmissible because of remoteness in time and further that the witness was unable to show the circumstances because she had not heard any conversation between defendant and Martha. The trial court, and we believe correctly, found no merit in either argument. Defendant also raised the proposition that an intent to kill could not be inferred from the December assault, which is the thrust of his argument on appeal. Defendant asserts that a simple assault with one's hands is insufficient to prove an intent to kill, citing *State v. Clark*, 214 Kan. 293, 521 P.2d 298 (1974). The general rule adopted in *Clark* appears in Syllabus ¶ 2 in these words:

"While generally it is held that hands and feet are not to be classed as deadly weapons *per se*, it is recognized they may be a means likely to produce death, that one may commit murder by means of an attack with fists or feet, and that they may become deadly weapons when used in such manner and under such circumstances as are reasonably calculated to produce death."

As distinguished from the vicious assault with fists in *Clark,* there is evidence here of strangulation—a most effective means of killing. As a basis for an inference of intent to kill we see very little distinction between use of the hands as fists in a vicious assault and use thereof to choke and effect strangulation. When hands are used to choke in such a manner and in such circumstances as are reasonably calculated to produce death they may become "deadly weapons" under the exception to the general rule as stated in *Clark.*

Moreover, as counsel for the State points out, the State's offer of the 60-455 evidence was not limited only to proof of intent to kill. The defense here was insanity, intoxication and intent to commit suicide. Where an act is susceptible of two interpretations, one innocent and the other criminal, then the intent with which the act is done becomes the critical element in determining its character. *State v. Wasinger,* 220 Kan. 599, 603, 556 P.2d 189 (1976); *State v. Nading,* 214 Kan. 249, 254, 519 P.2d 714 (1974). The defense of insanity puts in issue the capacity of the defendant to formulate not only a specific intent as to the crime charged but also his capacity to entertain in a legal sense a general criminal intent. *State v. Lohrbach,* 217 Kan. 588, 590, 538 P.2d 678 (1975).

In the instant case the trial court carefully followed the teachings of *State v. Bly,* 215 Kan. 168, as to the admissibility of evidence under 60-455. Applying the tests set out in *Bly* to the evidence here we find that intent was substantially in issue; there was similarity of conduct and circumstances in that both incidents were unprovoked attacks involving the same people in the same house after a sudden entrance by defendant on both occasions when he appeared to have been drinking. The evidence was relevant, and in view of its importance as proof of the critical issue in the case, it overbalances the potentiality for bias and prejudice when the admission thereof was followed by a proper limiting instruction. We find no error shown in this regard.

Defendant next claims the trial court erred in submitting an instruction on felony murder. Defendant concedes the trial court was compelled to so instruct under the mandate of *State v. Foy,* 224 Kan. 558, 582 P.2d 281 (1978), but suggests the holding in *Foy* was wrong and urges this court to reconsider its decision. In the alternative defendant pleads that if the court is reluctant to reverse its recent decision in *Foy* the defendant urges the court to

limit the holding in *Foy* to the specific facts therein and to reject the merger doctrine only in those instances where the intended assault is of someone other than the ultimate homicide victim.

The factual background, as related in *Foy,* is almost identical to that presented in the case at bar. Sharon Foy, the homicide victim, was the divorced wife of defendant Roger Foy, and as in the instant case the couple had continued to live together at various intervals, and their relationship during the marriage and after was characterized by frequent periods of discord and violence. The homicide, as in the instant case, occurred in the domicile of the victim. Defendant points out that in *Foy* the charge was that the defendant burglarized the home with the intent to assault the victim's mother and killed the victim during the burglary. We attached no significance to the separate identity of the intended assault victim in *Foy.* The thrust of our holding in *Foy* is simply that the merger doctrine for assault cases, as applied in *State v. Clark,* 204 Kan. 38, 460 P.2d 586 (1969), and cases cited therein, should not be extended to bar a felony murder instruction in a case where the underlying felony is aggravated burglary based upon an aggravated assault.

As was said in *Foy,* the evidence in the case at bar supports a finding that aggravated burglary was complete upon the unlawful entry of the defendant into the home with the prerequisite intent to commit a felony. In *Foy,* we specifically rejected the holding of *People v. Wilson,* 1 Cal. 3d 431, 82 Cal. Rptr. 494, 462 P.2d 22 (1969), the only case cited on the point by defendant in the instant case. We adopted the majority rule as set out in *Blango v. United States,* 373 A.2d 885 (D.C. 1977), and numerous other cases cited in the opinion for the court. What was said in *Foy* disposes of defendant's contentions in the case at bar and we adhere to our former decision.

We find no error in the trial court's submission of the felony murder instruction.

As his third and final point, defendant contends the trial court erred in refusing to instruct on criminal trespass as a lesser included offense of aggravated burglary. In *State v. Williams,* 220 Kan. 610, 556 P.2d 184 (1976), we specifically held that criminal trespass is not a lesser included offense of aggravated burglary. It follows that the requested instruction was properly rejected.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.

PRAGER, J., dissenting: I respectfully dissent from syllabus ¶ 4 and the corresponding portion of the opinion which hold the felony-murder doctrine to be applicable in this case. Here the aggravated burglary, the so-called independent felony required for invocation of the felony-murder rule, had, as an essential element, the intent to commit the same aggravated assault which was made upon the victim of the homicide. I cannot agree that the intent to commit the same assault may be used both as an element of the aggravated burglary and also as an element of the homicide, so as to make the felony-murder rule applicable. In that situation, the aggravated burglary is not a *collateral* felony but merges into the act of homicide. In his brief, counsel for the defendant offers two examples which demonstrate the injustice of the rule followed by the majority in this case. If a defendant approaches another man who is seated in an automobile, draws a gun, thrusts his arm through the window in the car, shoots, and unintentionally kills the man inside, he can be found guilty of felony murder. If on the other hand, a defendant approaches a man seated in an automobile, draws a gun, shoots and unintentionally kills the man inside, without thrusting his arm through the window, the defendant cannot be found guilty of felony murder. Such a distinction is not legally sound and is manifestly unjust. I reaffirm a similar position taken in my concurring and dissenting opinion in *State v. Foy,* 224 Kan. 558, 582 P.2d 281 (1978).