[Crim. No. 12316. Fourth Dist., Div. Two. Dec. 9, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL EDWARD BOWEN, Defendant and Appellant.

[Crim. No. 14575. Fourth Dist., Div. Two. Dec. 9, 1982.]

In re MICHAEL EDWARD BOWEN on Habeas Corpus.

COUNSEL

Mary F. McNeil, under appointment by the Court of Appeal, and McNeil & Muzik for Defendant and Appellant and Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Michael D. Wellington and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORRIS, P. J.**—Defendant was convicted of murder in the first degree (Pen. Code, § 187) and rape (Pen. Code, § 261, former subds. 2 and 3), and the alleged special circumstance that the murder occurred during the commission of the rape (Pen. Code, § 190.2, subd. (a)(17)(iii)) was found true. He was subsequently found to have been sane at the time of the commission of the murder and rape. Defendant, a minor at the time the offenses were committed, was sentenced for the murder to life imprisonment without possibility of parole. His sentence of six years for the rape was stayed. On appeal defendant claims inadequacy of trial counsel,[1] insufficiency of the evidence, prosecutorial misconduct, erroneous denial of a suppression motion, unduly prejudicial photographic evidence, improper jury instructions, and sentencing error. All but defendant's sentencing contention are meritless. Because he may not be sentenced to life without possibility of parole, we reverse as to penalty only.

The sentencing issue is the sole reason that this opinion qualifies for publication. (See Cal. Rules of Court, rule 976(b).) We therefore deal with it first. The facts of this case and the resolution of the remaining contentions follow.

SENTENCING

Defendant raises two issues concerning his sentencing. First, it is contended that defendant may not be sentenced to life imprisonment without possibility of parole because he was a minor at the time of the murder. Second, he asserts error in the fact that he was not sent to the California Youth Authority for evaluation prior to his sentencing.

■ Defendant relies on *People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal. Rptr. 521, 633 P.2d 186], to support his argument that he may not be sen-

---

[1]Defendant has also filed a petition for a writ of habeas corpus based upon the alleged incompetency of trial counsel, which petition is considered along with this appeal.

tenced to life without possibility of parole. *Davis* held that, under the 1977 legislatively enacted murder penalty statutes (former Pen. Code, § 190 et seq., Stats. 1977, ch. 316, p. 1256), the state is not allowed to imprison a minor for life without possibility of parole. (29 Cal.3d at pp. 827-832.) The 1977 legislation was replaced by the current law, an initiative measure adopted at the November 1978 General Election. The People now contend that the logic of *Davis* is inapplicable to the law under which defendant was sentenced. We disagree. For the purposes of the issue before us, the 1977 and 1978 laws are indistinguishable and we consider ourselves bound by *Davis*.

*Davis* noted that the 1977 law allowed the imposition of the death penalty in certain first degree murder cases, but that since 1921 minors have been expressly exempted from the death penalty. (See former and present Pen. Code, § 190.5) The same remains true under the 1978 law. It was then stated that "[a]lthough the [1977] statute does not also explicitly exempt minors from the sentence of life imprisonment without possibility of parole, neither the language nor the history of the statute supports an interpretation that would authorize imposing that harsh penalty on persons under 18." (29 Cal.3d, at p. 827.)

The *Davis* court listed four reasons for its holding. The primary reason was that "the history of the [1977] statute clearly reveals a specific and limited legislative intent, unrelated to any desire to impose harsher sanctions on minors." (29 Cal.3d, at p. 829.) While the intents behind the 1977 and 1978 laws are different from each other, they are the same in that there is an absence in both of any intent to specifically affect the penalties for minors. The impetus for the 1977 legislation was the Supreme Court's decision in *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101] which struck down the then-existing death penalty statute. However, *Davis* found it significant that "the Legislature retained unchanged the language exempting minors from the death penalty (former § 190.5), and made not the slightest suggestion that it intended the new penalty to be imposed on minors as an alternative to an ordinary life sentence. Clearly, the Legislature enacted this statute not as a means of increasing the penalty applicable to minors convicted of murder, but solely as a method to ameliorate the unconstitutionally harsh effect of the former death penalty procedures applicable exclusively to adults." (29 Cal.3d, at p. 830.)

The intent behind the 1978 law was to correct what its proponents perceived as weaknesses in the 1977 death penalty law. The argument in favor of the initiative stated that "the anti-death penalty politicians used their influence to make sure that the death penalty law passed by the State Legislature [in 1977] was as weak and ineffective as possible." (Ballot Pamp., Gen. Elec. (Nov. 7, 1978) p. 34.) The 1978 law expanded the list of special circumstances which re-

quire either the death penalty or life without possibility of parole, increased the sentence for second degree murder, and changed the minimum sentence for first degree murder. It made no change concerning the application of the murder penalty laws to minors. And, significantly, the initiative retained the exemption of minors from the death penalty. The absence of intent respecting minors in the 1977 law which was found significant by the *Davis* court is no different in the 1978 law.[2]

The second reason for its holding given by the *Davis* court was that "a contrary interpretation would lead to the anomalous requirement of a superfluous penalty hearing whenever a verdict of guilt with special circumstances is returned against a minor." (29 Cal.3d, at p. 831.) Former section 190.4, subdivision (a) mandated the hearing in order to choose between death and life without possibility of parole, the only two possible penalties for someone convicted of first degree murder with special circumstances (former § 190.2). However, such a hearing for a minor defendant would have been unnecessary since the minor was exempt from the death penalty (former § 190.5). *Davis* stated, "Hence, the omission of any exception to the mandatory language of former section 190.4, subdivision (a), further demonstrates the absence of legislative intent to provide life without parole as a sentencing alternative except in those cases to which the death penalty might also apply." (29 Cal.3d, at p. 831.) The same superfluous penalty hearing would result under the current law, since the 1978 version of section 190.4, subdivision (a) is identical to its 1977 predecessor.

Third, the *Davis* court found, "when the statute is read as a whole, it offers no basis for charging minors with special circumstances." (29 Cal.3d, at p. 831.) The court's discussion is directly applicable to this case since the 1977 statutes analyzed were left substantively unchanged by the 1978 initiative: "former section 190.1 authorizes disposition of a charge of special circumstances only in possible death penalty cases.[3] And although former section 190.4 contains the same authorization without the restriction, application of that section to minors leads by its own operation to the requirement of a meaningless penalty hearing, as we have just discussed. Moreover, because former section 190.1 can be viewed as a preface to the following sections, stating the context in which they are to be applied, the Legislature may have concluded

---

[2]The People argue that the 1978 law was passed with the intent to increase the punishment for murder. This is true (see *In re Jeanice D.* (1980) 28 Cal.3d 210, 219 [168 Cal.Rptr. 455, 617 P.2d 1087]), but not germane. The increased penalties apply generally and make no reference to minors. The court in *Davis* found it important that there was no intent in the 1977 law to deal *specifically* with the issue of punishment for minors. There is no more concern expressed for minors in the 1978 law than in the 1977 law.

[3]Former and present sections 190.1 both precede an outline of trial procedures with the phrase, "A case *in which the death penalty may be imposed* pursuant to this chapter shall be tried in separate phases as follows: . . . ." (Italics added.)

that repetition of its limitation in each subsequent section would be surplusage. Hence, viewed in context, the language of former section 190.4 authorizing determination of special circumstances charges is properly restricted to cases involving adults charged with first degree murder and subject to the death penalty." (29 Cal.3d, at p. 831.)

The final reasoning of *Davis* also applies to the 1978 law, "if the Legislature had intentionally and substantially increased the maximum penalty that could lawfully be inflicted on minors, we would have expected it to express its purpose clearly and set out the appropriate procedures in detail. Instead, we review a statute unclear in its effect on the penalty applicable to minors, silent regarding appropriate procedures by which the new penalty would be imposed on them, and devoid of evidence of any legislative intent to depart from the status quo. Consequently, the ambiguity must be resolved in defendant's favor by finding no authority for charging minors with special circumstances." (29 Cal.3d, at pp. 831-832, fn. omitted.)

The People contend that the 1978 law when read as a whole demonstrates a clear intent on the part of California voters to apply special circumstances and life without possibility of parole to all murderers whose crimes meet the stated requirements. The 1978 law, however, shows no clearer intent in this regard than the 1977 law, which the Supreme Court in *Davis* held could not be used to imprison a minor for life without possibility of parole.

If we were writing on a clean slate, we very probably would agree with the interpretation urged by the Attorney General. However, we consider ourselves bound by the decisions of the Supreme Court even when we disagree. Any reexamination of the statutory scheme must be left to that court.[4]

Because defendant is statutorily immune from the death penalty and, under the reasoning of *Davis*, cannot be imprisoned for life without possibility of parole, defendant must be sentenced to a term of 25 years to life, the only remaining penalty for murder (Pen. Code, § 190).

■ Defendant also claims that the trial court erred in not sending him to the California Youth Authority for evaluation before sentencing.

Welfare and Institutions Code section 707.2 states in part, "No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been re-

---

[4]The Supreme Court has recently agreed to decide whether the 1978 law permits the imprisonment of a minor for life without possibility of parole. (*People* v. *Sandoval* (Crim. 22523), hg. granted Mar. 17, 1982.) We hope that the court will take this opportunity to fully reevaluate *Davis*.

manded to the custody of the California Youth Authority for evaluation and report pursuant to this section and the court finds after having read and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority."[5]

The California Supreme Court has held that, "as used in section 707.2, 'a minor who was under the age of 18 years when he committed any criminal offense' includes not only persons who are sentenced prior to their 18th birthday but also offenders who committed the offense prior to their 18th birthday, but are older at the time of sentencing so long as they are within the age of persons subject to training and treatment by the Youth Authority. Such a person therefore must be remanded for evaluation and report concerning his amenability to training and treatment by the Youth Authority prior to being sentenced." (*People* v. *Black* (1981) 32 Cal.3d 1, 4 [184 Cal.Rptr. 454, 648 P.2d 104].)

Under the compulsion of *Black*, we conclude that the trial court erred in refusing to remand defendant to CYA for evaluation prior to sentencing.

FACTS

On Saturday evening, October 6, 1979, defendant drove from Beaumont with two friends in his mother's station wagon to a Redlands skating rink. During the half-hour drive to the rink, defendant and his two friends consumed a pint of rum and smoked three marijuana and hashish cigarettes between them. After some time at the rink, they saw three girls they knew, Trasie W. and two twin sisters, and later on the three boys and two of the girls, Trasie and one twin, drove back to Beaumont. Trasie and one of defendant's friends who were girl friend and boyfriend, sat by themselves in the back seat. The group parked near an oak tree and talked and smoked hashish for about an hour. Defendant then drove everybody home. The twin was dropped off first and then Trasie's boyfriend. Defendant's other friend was the next one to be driven home, leaving defendant and Trasie alone in the car.

Trasie's body was found the next morning near a dirt road in Cherry Valley. She was wearing only a pair of socks. An autopsy performed later that day revealed that she had suffered multiple skull fractures from eight blows to the head; that one of her teeth had been knocked out, probably by a fist; and that there was spermatozoa in her vagina.

A number of pieces of circumstantial evidence connected defendant to the homicide. An orthodontist testified that a wound on defendant's left wrist was

[5]Because defendant will be sentenced to a term of 25 years to life, he will be eligible for CYA commitment. (*In re Jeanice D., supra,* 28 Cal.3d 210.) Had he been properly sentenced to life imprisonment, he would not be eligible. (Welf. & Inst. Code, § 1731.5, subd. (b); see also *People* v. *Garcia* (1981) 115 Cal.App.3d 85, 108-111 [171 Cal.Rptr. 169].)

probably caused by striking the wrist against teeth, possibly Trasie's teeth. Tire tracks at the murder scene were found to have the same tread design and wear patterns as tires on defendant's mother's station wagon. A footprint at the scene was determined to have been made by defendant. Blood on Trasie's socks was consistent with defendant's blood type. A button and a gold fiber found in the station wagon matched Trasie's blouse, which was found ripped and with one button missing. A tire iron located at the scene had human blood and hair on it. The hair was similar to Trasie's hair. The tire iron fit the clips in the station wagon's spare tire compartment. A blood stain found in the rear interior portion of the station wagon was consistent with Trasie's blood type.

Defendant's trial counsel did not contest the fact that defendant had done the killing, but offered a diminished capacity defense.[6] A psychologist who examined defendant testified that defendant has a mental disorder, suffers from extreme psychopathology and at times becomes psychotic. She said that 98 percent of all adolescents are better able to control their impulses and conform their behavior within limits and expected rules and regulations than defendant. In rebuttal, the prosecution put on the testimony of a psychiatrist who had also examined defendant. The psychiatrist said that he found no evidence of any significant mental disorder. During their examinations of the defendant, both the psychologist and the psychiatrist were told by defendant about how he had killed Trasie. Both testified concerning the substance of defendant's admissions.

After defendant was found guilty, the psychologist, the psychiatrist, and defendant testified at the sanity phase of the trial. The psychologist testified that although defendant knew the difference between right and wrong and could appreciate the criminality of his behavior, he lacked the substantial capacity to conform his conduct to the requirements of the law. The psychiatrist testified that defendant was legally sane because he did not suffer from any mental disorder. Defendant's testimony confirmed what the jury had been told during the guilt phase of the trial about the events preceding the homicide. He then described how he killed Trasie W.[7] Defendant repeatedly testified that he could think of no reason for committing the crimes.

---

[6] In his opening statement, given after the prosecution had rested, defense counsel stated, "The evidence will show that Michael Bowen did in fact kill Trasie [W.] Kill, not murder."

[7] Under questioning from his attorney, defendant related the following:

She kept telling me—telling me about how I wasn't going to get away with it. And so I—I told her to take off her clothes and she took them off. And I took mine off.

"And I think at that time she tried to—to escape from the front door [of the parked station wagon]. And I stopped her. And we tried to have intercourse in the front seat and we couldn't do it. So we got in the back and we did it.

"Then, you know, she kept—she kept telling me how I wasn't going to get away with it and that her brother was going to kill me and everything. And when we got done and I got dressed —well, I put my pants on. And we got out of the car. We was sitting on the tailgate and we was just talking about stuff.

"And she just kept telling me how Richard was going to kill me. And I hit her with my hand

## COMPETENCY OF COUNSEL

■ Before a conviction can be reversed because of the violation of a defendant's constitutional right to the effective assistance of trial counsel, the defendant has the burden of showing that his attorney "failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates" and "that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal. Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant here presents an extensive list of acts and omissions by his trial attorney which are alleged to have deprived him of his right to effective counsel. None of them, either singularly or collectively, constitutes grounds for reversal.

The defendant has filed a petition for habeas corpus, which we have considered in connection with this appeal. (*People* v. *Pope, supra,* 23 Cal.3d. at pp. 425-426.)

However, in this case, no hearing is necessary because even without trial counsel's explanation it is clear from the record before this court that defendant was not denied the effective assistance of counsel.

Defendant's primary allegations of incompetency revolve around trial counsel's decision to present a diminished capacity defense instead of challenging the allegation that defendant killed Trasie W. It is asserted that trial counsel was incompetent in having the psychologist testify about defendant's "confession" to her of the rape and murder; failing to pursue a *Hitch* motion to suppress one piece of circumstantial evidence; failing to object to the admission of other allegedly inadmissible circumstantial evidence; failing to investigate and present a circumstantial evidence defense; and failing to move for acquittal on the rape charge and special circumstance allegation, pursuant to Penal Code section 1118.1, after the prosecution had presented its case. Counsel's decision to tacitly admit that defendant had committed the acts alleged in order to present a diminished capacity defense (see *People* v. *Corona* (1978) 80 Cal.App.3d 684, 702, fn. 7 [145 Cal.Rptr. 894]) was clearly a tactical one, and, based on the record, such decision was proper and wise.

As this court has stated before, "Trial tactics are largely a matter left to counsel and reviewing courts are loathe to second-guess counsel in such matters." (*People* v. *Mastin* (1981) 115 Cal.App.3d 978, 987 [171 Cal.Rptr. 780]; see

---

and she fell to the ground. She kept screaming and yelling. And I told her a couple times, you know, to stop screaming and yelling. And she wouldn't. She wouldn't stop.

"So I seen the crowbar there. And I got it and hit her. And when I got done I just—I just threw it as far as I could. And then I—I didn't even realize I did it until I, you know, I looked at her. And then, you know, I was really scared. You know, I didn't know what to do. So I put her in the bushes, got in my car and drove away."

also *People* v. *Jackson* (1980) 28 Cal.3d 264, 289 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. (1981) 450 U.S. 1035 [68 L.Ed.2d 232, 101 S.Ct. 1750]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].) This is especially true in this case where the tactical choice is so patently reasonable. The circumstantial evidence that defendant committed the rape and killing was overwhelming. Even if counsel could have succeeded in excluding all but a small part of the prosecution's evidence, that part would likely have established his guilt. Therefore, when counsel realized that enough circumstantial evidence would be admitted to make it probable that the jury would find defendant culpable for the charged acts,[8] counsel chose the alternative course of asserting a diminished capacity defense. This is not incompetence.

On appeal, defendant characterizes the prosecution's evidence as "tenuous" and "very weak." As for the rape charge, it is asserted that the "only" evidence that a rape occurred is the presence of sperm in Trasie's body, the nudity of the body, and the violence surrounding the crime. The incredible argument is then made that "[a]ll of this evidence could just as easily be reconciled with a voluntary sexual experience or an attempt to impede identification of the victim after she was killed." Trial counsel's apparent belief that the jury would not reach such a conclusion is testimony to his good common sense and professional competence, and not proof of incompetence.

Defendant also alleges attorney incompetence in the presentation of assertedly inadequate diminished capacity and insanity defenses. He faults his counsel for not showing his medical records to the psychologist before she completed her report. He contends that several incidents in defendant's past could have led her to do medical tests for brain damage. This does not show that a potentially meritorious defense was withdrawn. The psychologist testified *for* defendant in both the guilt and sanity phases of the trial. She testified that if she had done the additional tests, it "would have possibly added to what I already have," and it would not have changed her opinion.

Defendant further complains that despite counsel's awareness of the weakness of the insanity defense, counsel "called no new witnesses, had no medical tests done, introduced no information concerning defendant's drug abuse nor did he strengthen his case in any way." There is no contention, however, that a stronger case could have been made. Defense attorneys must play the cards they are dealt. Counsel is not automatically incompetent because the prosecu-

---

[8]For example, defendant on appeal does not even suggest how such evidence as defendant's footprint, the tire tracks, the tire iron, and the fact that defendant and Trasie were seen driving alone together shortly before the killing could have been kept from the jury.

Moreover, the grounds suggested by defendant for excluding other evidence often border on the frivolous. For example, a photograph of a skate, a shoe and a bra taken one-half mile from the murder scene was introduced, even though, the defendant argues, "no one testified to personal knowledge of a connection of the items to Trasie [W.]"

tion had a very solid case against his client. "The fact that there is a conviction is immaterial. Some defendants simply *are* guilty, and their guilt can be overwhelmingly established by legally admissible evidence while at the same time giving full recognition to their legal and constitutional rights." (*People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1001 [118 Cal.Rptr. 391], original italics.)

### SUFFICIENCY OF THE EVIDENCE

■ In analyzing defendant's contention that the evidence is insufficient to support his conviction we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The evidence in the present case is not just substantial; it is overwhelming. Defendant's extended attempt to offer innocent explanations for numerous pieces of circumstantial evidence is irrelevant.

■ Defendant also fails in his attempt to show that the prosecution did not prove certain elements of the crime of rape. It is argued, for example, that there was no evidence that defendant and Trasie were not married. Such fact can be shown by circumstantial evidence, including the facts that Trasie was a mere school girl bearing her maiden name and living with her parents and that she was the girl friend of one of defendant's friends. (See *People* v. *Toliver* (1969) 270 Cal.App.2d 492, 497 [75 Cal.Rptr. 819], cert. den., 396 U.S. 895 [24 L.Ed.2d 172, 90 S.Ct. 193].) Similarly, defendant's unsupported assertion that "[w]ithout testimony from the victim fear could not be established" is particularly unpersuasive.

### PROSECUTORIAL MISCONDUCT

■ Defendant lists approximately 15 different alleged misstatements of the evidence made by the prosecutor to the jury. The statements cited range from the marginally relevant to the clearly inconsequential.[9] In any event, defense counsel made no objections. "Generally both . . . [an] objection and [a] request [for jury admonitions] are required before allegations of misconduct will be considered on appeal, unless the act or remark is of such a character that a harmful result cannot be cured by any timely admonition." (*People* v. *Cruz*

---

[9]In commenting on the psychologist's testimony that defendant was confused and fearful at the time of the crime, the prosecutor said, "Well, I can imagine that this girl weighed 104 pounds, Michael is a linebacker on a high school football team, I can well imagine how Michael Bowen is full of fear." On appeal, it is pointed out, apparently in all seriousness, that there was no evidence introduced that Trasie weighed 104 pounds, even though the pathologist who conducted the autopsy testified that Trasie "weighed about one hundred pounds."

(1980) 26 Cal.3d 233, 255 [162 Cal.Rptr. 1, 605 P.2d 830].) We have reviewed the record and hold that the exception to the general rule is not applicable here.[10]

## SUPPRESSION MOTION

Within two days of the murder a search warrant was issued for the station wagon belonging to defendant's mother. Five months later the car was still being held by the police. On appeal defendant challenges the omission of facts from the affidavit on which the search warrant issued, claims that the execution of the search warrant took an unreasonable length of time, and asserts that the warrant did not authorize the seizure of the car.

■ The search warrant was issued based on the sworn statement of Deputy Sheriff Bowser. In his statement Bowser related, inter alia, that he had been at the murder scene, had observed dried blood spots on a fire hydrant near Trasie's body, had examined the station wagon one day after the murder, and had "personally observed what appeared to be dried blood drops similar in appearance to what I had observed on the fire hydrant, in three different locations on the vehicle." Defendant complains that Bowser's statement did not contain defendant's explanation for the blood stains. At the time that he examined the station wagon, Bowser saw an injury on defendant's left wrist. Defendant told Bowser that he had cut his wrist by closing the tailgate on his arm and that the blood on the tailgate portion of the car was from that cut.

The law for evaluating omissions from search warrant affidavits was stated by the Supreme Court in *People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal. Rptr. 667, 618 P.2d 213] cert. den. (1981) 451 U.S. 987 [68 L.Ed.2d 844, 101 S.Ct. 2321]. There it was held that omissions, like misstatements, can hinder "the magistrate's inference-drawing powers and increase[] the likelihood that privacy will be invaded without probable cause." (*Id.,* at pp. 383, 384.) To be sanctionable, the omission must have been "material" and not reasonably made. (*Id.,* at pp. 387-388.) In the present case, we need not analyze the culpability of Bowser's conduct since the omitted facts were not material.

"[F]acts are 'material' and hence must be disclosed if their omission would make the affidavit *substantially misleading.* On review under section 1538.5,

---

[10]Defendant also relies on a second exception to the general rule, namely, where the case is closely balanced and there is grave doubt of defendant's guilt and the acts of misconduct are such as to contribute materially to the verdict. Appellate counsel has not done her homework. The Supreme Court held that this "is not properly an exception to the objection requirement" and expressly disapproved of the line of cases relied on by defendant. (*People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 758-759 [175 Cal.Rptr. 738, 631 P.2d 446].)

facts must be deemed material for this purpose if, because of their inherent probative force, there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination." (*People* v. *Kurland, supra,* 28 Cal.3d at p. 385; original italics.) Under this definition, defendant's innocent explanation for the presence of blood stains in the car was not material.

██ Defendant also asserts a violation of Penal Code section 1534, which requires a search warrant to be "executed and returned within 10 days after date of issuance." Deputy Sheriff Bowser filed a return ten days after the warrant issued stating that the warrant had been executed, but that the car was still at the criminal justice laboratory where, according to a criminalist, the processing of the car would take approximately two more weeks. The car remained at the laboratory for over five months. Defendant argues that any evidence taken from the car more than 10 days after the warrant issued should have been suppressed.

Defendant contends, without citing any authority, that the time taken in the execution of the warrant was clearly unreasonable and thus requires the suppression of evidence. No violation of section 1534 has been shown. The warrant *was* executed and returned within 10 days. (See *People* v. *Schroeder* (1979) 96 Cal.App.3d 730, 733-734 [158 Cal.Rptr. 220].) The Supreme Court has consistently upheld scientific examinations of vehicles, some for extended periods of time, even when no warrant was obtained. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 549-550 [146 Cal.Rptr. 732, 579 P.2d 1048]; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 305-306 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *People* v. *Teale* (1969) 70 Cal.2d 497, 507-513 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Talbot* (1966) 64 Cal.2d 691, 708-709 [51 Cal.Rptr. 417, 414 P.2d 633], cert. den. (1967) 385 U.S. 1015 [17 L.Ed.2d 551, 87 S.Ct. 729], overruled on another point in *People* v. *Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22]; cf. *People* v. *Minjares* (1979) 24 Cal.3d 410, 421-422 [153 Cal.Rptr. 224, 591 P.2d 514] cert. den., 444 U.S. 887 [62 L.Ed.2d 117, 100 S.Ct. 181].) It would indeed be anomalous to impose exclusionary sanctions in this case when the constitutional warrant requirement has been complied with. Even were we to find a violation of section 1534, it would not raise an issue of constitutional magnitude and would not result in the suppression of evidence absent a showing of prejudice to the defendant. (*People* v. *Kirk* (1979) 99 Cal.App.3d 89 [160 Cal.Rptr. 184]; *People* v. *Couch* (1979) 97 Cal.App.3d 377 [158 Cal.Rptr. 647].)

██ Finally, defendant claims that the station wagon was improperly seized because such seizure was not authorized by the search warrant. The warrant listed such things as tire impressions, blood stains, and human hair as the property that might be seized, and named the station wagon as the place where the property would be found. Defendant asserts that there was no authority,

however, to seize the "place to be searched." Defendant did not make a timely and specific objection on this ground in the trial court and is thus precluded from raising this issue for the first time on appeal. (*People* v. *Superior Court (Wells)* (1980) 27 Cal.3d 670, 673 [165 Cal.Rptr. 872, 612 P.2d 962].)

### PHOTOGRAPHIC EVIDENCE

■ Twelve photographs taken at Trasie's autopsy were introduced into evidence with no objection by defense counsel. On appeal, defendant asserts this as an example of trial counsel's incompetence and, independently, contends that the trial judge abused his discretion in not excluding the photographs as unduly prejudicial. (See Evid. Code, § 352.) We have viewed the photographs and conclude that there was no abuse of discretion, nor did counsel's failure to object withdraw a potentially meritorious defense. The photographs were relevant on the issue of malice. Further, as this court stated in a similar case, "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant. . . . [¶] [The pictures are] [g]ruesome, yes, but factually gruesome. However, they are not unnecessarily hideous, ghastly, horrible or dreadful. Inflammatory? Definitely not. They are fair, if unpleasant, representations of an unpleasant situation which happened to be brought on by this defendant's actions." (*People* v. *Long* (1974) 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530], fn. omitted; see also *People* v. *Frierson, supra,* 25 Cal.3d 142, 171.)

### JURY INSTRUCTIONS

■ Defendant claims that his conviction of first degree murder was based on alternate theories, deliberate murder and felony murder, one of which, the deliberate murder theory, was legally incorrect. He is entitled to a reversal, he asserts, because "when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People* v. *Green, supra,* 27 Cal.3d 1, 69.) Defendant's argument as to why the deliberate murder theory is legally incorrect is unclear. However, we need not decipher the argument, because in this case we can determine that the guilty verdict rested on the felony-murder theory. In finding the existence of a special circumstance, the jury expressly found that the murder occurred during the commission of the rape.

The judgment is reversed as to the penalty and the cause is remanded with directions to determine the appropriate disposition consistent with the views ex-

pressed in this opinion. In all other respects, the judgment is affirmed. The petition for a writ of habeas corpus is denied.

McDaniel, J., and Trotter, J., concurred.

A petition for a rehearing was denied December 27, 1982, and the petitions of both parties for a hearing by the Supreme Court were denied March 16, 1983.